UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

AMER RIZVI,
          *Plaintiffs*,

    v.

LOUDOUN COUNTY SCHOOL BOARD,
ET AL,
          *Defendants.*

No. 1:25-cv-307-MSN-IDD

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Loudoun County School Board's ("LCSB") Motion to Dismiss the Amended Complaint (ECF 7). Defendant LCSB seeks to dismiss all discernible claims raised in the Amended Complaint (ECF 4) for discrimination, retaliation, and hostile work environment in violation of Title VII, Section 1981, and the Age Discrimination in Employment Act ("ADEA"), and violation of Plaintiff's due process rights arising out of Plaintiff's employment as a public school teacher by LCSB. ECF 8. For the following reasons, Defendant's Motion (ECF 7) will be **GRANTED** and the Amended Complaint **DISMISSED**.

I.    **INTRODUCTION**

    A.    **Factual Background[1]**

Plaintiff Amer Rizvi is a fifty-eight-year-old, brown-skinned American Muslim male of Pakistani origin who worked as a licensed public school teacher for Loudoun County Public Schools at Sterling Middle School from August 2022 until June 2024. ECF 4 ("Am. Compl.") at PageID# 36. Plaintiff alleges that he faced various forms of illegal discrimination throughout his

---

[1]    At the motion-to-dismiss stage, this Court "accept[s] as true all of the factual allegations contained in the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).

employment. This includes suffering "escalating forms of targeted retaliation, including fabricated charges, negative evaluations, surveillance, isolation, and hostile working conditions," in response to making "17 formal and numerous informal reports with HR."[2] *Id.* Plaintiff also states he was "subjected to a prolonged hostile work environment for almost two years" involving conduct like:

- "Bullying in private meetings where multiple administrators would confront him without support or notice;"[3]

- "Denial of reasonable requests for ethnic/religious support persons in disciplinary meetings;"[4]

- "Collusion among staff to cause plaintiff to miss mandatory meetings and IEP sessions;"[5]

- "Surveillance, public shaming, and physical removal of his teacher desk;"[6]

---

[2]     These concerned matters including "child abuse by the principal (TV broadcast footage of public shaming and inappropriate touching) with principal informing plaintiff that HR had disclosed informant (plaintiff) name to him," "documenting racial slurs, racial gestures, and hate symbols (e.g., swastikas) targeting students and Plaintiff," "reporting systemic discrimination against Black and Muslim students," "reporting the intentional display of religious symbols designed to marginalize him," "reporting collusion among staff to sabotage meetings and falsify documentation," and "reporting animal cruelty in classroom curriculum." Am. Compl. at PageID# 36, 37.

[3]     Plaintiff's EEOC charge states he was "continuously harassed by administrators in meetings from the first day of school until [May 13, 2024]." ECF 8-1 at 1. The EEOC charge, although not attached to the Amended Complaint but rather the Motion to Dismiss, may be considered because it is "integral to the complaint and authentic." *Goines v. Valley Cmty. Servs. Bd.*, 822 F. 3d 159, 164 (4th Cir. 2016).

[4]     This allegation refers to the meetings discussed *supra* note 3. ECF 8-1 at 1 ¶ 1.

[5]     This allegation pertains to actions of Plaintiff's co-teachers on or about January 23, 2024. ECF 8-1 at 2 ¶ 24.

[6]     Plaintiff's desk was removed on November 15, 2023 because LCPS administrator Mr. Martinez "did not want to see a brown skinned Muslim male seated in the front of an LCPS classroom and wanted me to stand." ECF 8-1 at 2 ¶ 20. Additionally, "Dr. Gallardo would repeatedly intimidate me by stalking me in the hallways. The last instance of this occurred on [February 8, 2024]." *Id.* ¶ 13.

- "Being emailed Swastikas with a statement that they were found in many cultures when he complained of their appearance in his classroom; the administration referring to Swastikas as 'an element of speech;'"[7]

- "Defamation in CLT meetings and internal school communications;"[8]

- "Subjected to inappropriate questioning when seeking to start his Muslim Cultural Bridges Club;"[9]

- "Repeatedly being followed and intimidated by a vice principal in the hallways;"[10]

- "Intentional setup to fail during state testing supervision;"[11]

- "Administrative negligence in response to a pipe bomb threat to his house;"[12]

- "Threatening the plaintiff by inquiring about his daughters' (students at LCPS schools) well-being after he stated his intent to rebut a summative evaluation for discriminatory content;"[13]

---

[7]    The EEOC charge does not specify when these allegations occurred but avers that "[t]he administration refused to take my complaint of two Swastikas drawn in my class seriously. When I complained, I received pictures of four Swastikas stating, 'Swastikas can be found in many cultures.' Dr. Gonzalo Gallardo, a vice principal, referred to the Swastika as 'an element of speech.' They disagreed with me that the Swastika was a symbol of hate." *See* ECF 8-1 at 2 ¶ 11.

[8]    The EEOC charge does not specify when these allegations occurred, although they appear to be related to claims that co-teacher Bennett "on several occasions threatened to have me 'removed' from the classroom, and repeatedly harassed and slandered [Plaintiff]" and that he was "defamed on several occasions including for wearing a poncho, [his] weekly praises tampered with, and [his] 'Trusted Adult Certificate' moved." ECF 8-1 at 2 ¶¶ 40, 27. They may also be related to the claim that Bennet "manipulated students to concoct a series of fictitious charges and have them presented to Ms. Barham," ultimately resulting in Plaintiff's termination. *Id*. ¶ 28.

[9]    The EEOC charge does not specify when this allegation occurred. *See* ECF 8-1 at 2 ¶ 16.

[10]    The EEOC charge claims that "Dr. Gallardo would repeatedly intimidate [Plaintiff] by stalking [him] in the hallways. The last instance of this occurred on [February 8, 2024]." ECF 8-1 at 2 ¶ 13.

[11]    This allegation refers to a December 7, 2023 incident where administrators assigned Plaintiff a special education student to assist him in hall monitoring duty for a state examination and then reprimanded him for "failing to meet testing conditions." ECF 8-1 at 2 ¶ 22.

[12]    In May 2023, a student told Plaintiff that he would pipe bomb Plaintiff's house, but administration "simply moved [the student] to another room next door" and Plaintiff and his family felt unsafe. ECF 8-1 at 2 ¶ 12.

[13]    Plaintiff's summative evaluation report was issued on May 13, 2024. ECF 8-1 at 2 ¶ 21.

- "Insults and racial slurs by his co-teacher and equity lead [Ms. Bennett] creating a hostile work environment [], including calling him a 'Paki,' or statements like 'You are not going to demand respect from my students or from myself,' '[d]o me a favor and stay out of my face and do your job,' '[i]f you keep on, you can get out. How about that?' 'You're too old to be acting like this[,]' [and] 'I'm going to have you removed.'"[14]

*Id*. at PageID# 37, 38.

Plaintiff claims that on February 21, 2024, he was "publicly and humiliatingly escorted from school premises based on eight fabricated allegations" that were "orchestrated by Ms. Elisa Bennett" (Plaintiff's co-teacher and an equity lead), "endorsed by Vice Principal Elena Barham, and forwarded to Human Resources (HR) without investigation or due process." *Id*. at PageID# 36. As a result, Plaintiff was placed on paid administrative leave. Plaintiff states that the charges were based on "malicious misrepresentations and Islamophobic stereotypes lacking factual support of due process." *Id*.

Plaintiff also received "two unjust negative evaluations in the 2023-2024 school year as part of a deliberate campaign to terminate his employment."[15] *Id*. at PageID# 38 ("Discriminatory Evaluations and Retaliatory Documentation."). One of these evaluations, presented to Plaintiff on May 13, 2024, was authored by Principal Frew and Vice Principal Barham and marked "all 54 teaching standards" as "not met, which was unprecedented." *Id*. at PageID# 37. Plaintiff's name

---

[14]     Ms. Bennett made the "Paki" remark on November 10, 2023 and "on several occasions, referred to [Plaintiff's] age in class, including calling [him] 'too old.'" ECF 8-1 at 2 ¶¶ 25, 26.

[15]     *See* Am. Compl. at PageID# 38 ("Administrators falsely claimed he failed to submit his Plan of Improvement (POI) documentation, despite clear evidence that all artifacts were submitted via email with acknowledgment. Administrators and HR then used this fabricated 'non-compliance' to justify further retaliation, including a 'Support Plan' that was in essence a covert termination track. There was evidence of division-wide collusion involving HR and the Director of Middle School Education to target the Plaintiff.").

"Rizvi" was "deliberately misspelled" forty times "despite HR being informed of these occurrences previously," which he asserts constitutes "religious and racial disparagement." *Id*. During this meeting, Plaintiff was given a blank resignation form and told to resign in five working days or face termination. *Id*. "Under threat and pressure (including an explicit warning that termination would damage future employment), Plaintiff resigned on May 17, 2024 . . . effective [] June 14, 2024, and noted in handwriting on the form, above his signature, that he was 'threatened with termination.'" *Id*. Plaintiff contends this amounts to "constructive discharge and engineered termination." *Id*. at PageID# 36.

Subsequently, Plaintiff filed a complaint with the Virginia Office of Civil Rights ("VOCR") on June 11, 2024 and a separate charge with the EEOC on November 5, 2024. *Id*. at PageID# 38. The EEOC issued him a Right to Sue Letter on November 19, 2024. *Id*. Plaintiff alleges that on February 13, 2025 ("one day before the deadline to sue"), he was informed by Defendant that most allegations of the investigation initiated in February 2024 had been deemed "inconclusive," but one was found to constitute a violation of LCPS Policy 7014 and "retained in [his] [personnel] file as retaliation" to "damage future employment. *Id*. at PageID# 36, 38.

Separately, Plaintiff asserts that his procedural rights and due process were violated when he was "denied the right to include a rebuttal to the charge retained in his personnel file," "denied access to investigation findings," "ignored in his requests for clarifications and corrections," and "faced coercion for access to private medical records that would reveal stress caused by workplace bullying." *Id*. at PageID# 38.

Further, he suffered "racial discrimination and isolation" by being "forced into separation from white teachers without justification," "reprimanded for entering a shared space with a white teacher present," "isolated during team meetings and denied mentorship," and "subjected to false

accusations of creating a hostile environment when raising valid institutional concerns about racism against Black people by a veteran white math teacher." *Id*. at PageID# 38, 39.

### B.    Procedural History

Plaintiff filed suit in this Court on February 18, 2025, asserting violations of Title VII and ADEA. ECF 1. The original complaint was not served and its summons were returned unexecuted on May 16, 2025, at which time Plaintiff filed the currently operative Amended Complaint (ECF 4), which asserts claims for violations of Title VII, Section 1981, ADEA, and due process. ECF 4 at PageID# 35, 38. Loudoun County School Board was served[16] with the Amended Complaint on May 19, 2025 (ECF 6) and appeared by counsel and moved to dismiss the Amended Complaint on May 9, 2025. Plaintiff filed a response in opposition to the Motion to Dismiss on July 31, 2025. ECF 16, 26. Defendant filed a reply in support of the Motion on August 8, 2025. ECF 24. A hearing on the Motion was scheduled for August 22, 2025, although the Court terminated the hearing and has dispensed with oral argument because it would not aid the decisional process. [17]

## II.    LEGAL STANDARD

This Court may dismiss a claim when the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6),

---

[16]    Although the Amended Complaint names Fitzroy Frew, Elena Barham, Elisa Bennett, and Gonzalo Gallardo as individual defendants, it does not appear that they were ever served and Plaintiff has conceded that he is not seeking relief from the individual defendants and is proceeding solely against LCSB. ECF 25 at PageID#128.

[17]    Upon Defendant's Motion to Strike the opposition due to its inclusion of full minor names (ECF 22), Plaintiff moved to file a revised opposition with redactions and technical corrections. ECF 25. Magistrate Judge Davis denied the Motion to Strike and granted Defendant's Motion to Seal the original unredacted opposition. ECF 33. The Court has considered both versions of the opposition, which are substantively the same, in ruling on the Motion to Dismiss. Plaintiff's Motion to Redact Names of Minors, Clarify Defendant, Amend Response, and Extend Hearing Date will be granted in part except as to the request to continue the August 22, 2025 hearing, which will be denied as moot.

Plaintiff's opposition requested that the Court "take into account certain allegations and facts that were part of the original complaint but were inadvertently omitted from this amended version." The Court declines to do so, because the original complaint was not served on LCSB and because an amended complaint supersedes the original, rendering the original "of no effect." *Fawzy v. Wauquiez Boats SNC*, 873 F. 3d 451, 455 (4th Cir. 2017).

a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When considering a motion under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). But this Court need not credit conclusory allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009).

## III.    DISCUSSION

The Amended Complaint, construed most liberally, as any *pro se* complaint must be, asserts claims for violations of Title VII (race discrimination, retaliation, and hostile work environment), Section 1981 (race discrimination, retaliation, and hostile work environment), ADEA (age discrimination and hostile work environment), and due process (procedural and substantive). *See generally* Am. Compl. Defendant moves to dismiss all of these claims.

### A.  Title VII Time Bar

As an initial matter, to the extent that the Amended Complaint asserts Title VII discrimination or retaliation theories founded upon discrete or separately actionable "unlawful employment practices" that occurred before August 16, 2023, these acts are not cognizable due to Title VII's 300-day time period for the filing of a charge, here running from Plaintiff's June 11, 2024 complaint with VOCR.[18] 42 U.S.C. § 2000e–5(e)(1); *Mezu v. Morgan State Univ.* 467 F. Appx. 385 (4th Cir. 2010) (citing *Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 114) (2002) ("Discrete acts . . . are not actionable if time barred, even when they are related to acts alleged in timely filed charges."). Defendant identifies several allegations in the EEOC charge as occurring

---

[18]    This time bar applies only to Plaintiff's Title VII claims and not his Section 1981 claims, because the latter are subject to a four-year statute of limitations. 28 U.S.C. § 1658(a); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004).

in 2022 and 2023 as discrete and time-barred, to which Plaintiff responds that he has asserted continuing discrimination from September 2022 to May 13, 2024, seemingly invoking the continuing violation theory, which allows for consideration of untimely, non-discrete events that are part of a single, ongoing pattern of discrimination (i.e., when the incidents make up part of a hostile work environment claim). ECF 8 at 7; ECF 26 at PageID# 133; *see also Holland v. Washington Homes Inc.*, 487 F. 3d 208, 219 (4th Cir. 2007); *id.* (continuing violation theory does not apply to discrete acts). The Court finds that some, but not all, of the acts challenged by Defendant are time-barred for purposes of the Title VII claims.[19]

### B.  Title VII, Section 1981, and ADEA Discrimination

Relevant to discrimination, the Amended Complaint posits (under a section titled "Discriminatory Evaluations and Retaliatory Documentation") that Plaintiff suffered two "unjust negative evaluations in the 2023-24 school year" as part of a ruse to terminate him, noting also that administrators "falsely claimed he failed to submit his Plan of Improvement [] documentation"

---

[19]    Specifically, Defendant challenges as discrete the allegations that: (1) in September 2022, he was charged with creating a hostile work environment and threatened with termination for raising a Black child's complaint of racism by a White teacher; (2) an unjust school policy was enacted to separate him from White teachers as retaliation for reporting race discrimination at an unspecified time, making it difficult for him to perform school duties; (3) he was given a negative evaluation and extra work for reporting racial discrimination and placed on a Plan of Improvement; (4) in May 2023, school administrators insufficiently responded to a student's threat to pipe bomb Plaintiff's home; (5) in April 2023, a White administrator came to Plaintiff's classroom and asked him to step out with a disparaging finger gesture; (6) in October 2022, a staff member began a planning session by projecting an image of a church and church materials were repeatedly placed in Plaintiff's mailbox; (7) in October 2022, Plaintiff was reprimanded for providing "differentiated math instruction to a Pakistani student" and for "asking if LCPS provided language aides for immigrant students with limited language proficiency;" and (8) in November 2022, Plaintiff was reprimanded for "submitting complaints" and threatened with "further consultations with the HR department." ECF 8 at 7 (citing ECF 8-1).

"A discrete act required to support such a claim is an adverse employment action" as required to state a Title VII discrimination or retaliation claim. *Tassy v. Buttigieg*, 51 F. 4th 521, 529 (2d Cir. 2022). For retaliation claims, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (cleaned up). For discrimination claims, a plaintiff must show that the action "brought about some disadvantageous change in employment term or condition." *Muldrow v. City of St. Louis, Mo.* 601 U.S. 346, 354-55 (2024). Accordingly, the Court finds that allegations 1, 2, and 3 (pertaining to retaliation) and 4 (pertaining to discrimination) are discrete and time-barred, whereas allegations 5, 6, 7 and 8 (to the extent 8 implicates any racial nexus at all) are not discrete.

to further retaliate against him by putting him on a "Support Plan" that was "in essence a covert termination track." Am. Compl. at PageID# 38 ("There was evidence of division-wide collusion . . . to target [] Plaintiff."). Plaintiff also contends that he suffered "[r]acial [d]iscrimination and [i]solation" arising out of his "[f]orced [] separation from white teachers without justification" and "false accusations of creating a hostile environment when raising valid instructional concerns about racism against Black people by a veteran white math teacher." *Id*. at PageID# 38, 39. Read liberally, the Complaint's allegation of racist and (purportedly) ageist comments by co-teacher Ms. Bennett, taken with her stating e.g., "I am going to have you removed" and the allegation that Bennett "manipulated students to concoct a series of fictious charges ["malicious" and "Islamaphobic"] and have them presented to [Vice Principal] Barham," resulting in them being "upgraded to HR who used them to have me removed from the school premises," also raises discrimination under a cat's paw theory. Am. Compl. at PageID#36, 38; ECF 8-1 at 2 ¶¶ 25, 28.

To survive a motion to dismiss, a discrimination claim must plausibly allege (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside of the protected class. *Coleman v. Md. Ct. of Appeals*, 626 F. 3d 187, 190 (4th Cir. 2010); *see also Edouard v. John S. Connor, Inc.*, 2023 WL 3127622, at *5 (E.D. Va. April 27, 2023) (causation required for Title VII and Section 1981 claims); *Couch v. City of Va. Beach*, 768 F. Supp. 3d 741, 754 (E.D. Va. 2025) (causation required for ADEA claims). Defendant initially argued that Plaintiff has failed to plead the requisite adverse employment action, satisfactory job performance, or differential treatment. ECF 8 at 15-17. Plaintiff, in response, most relevantly emphasized that he had been constructively discharged, ECF 26 at PageID# 140, although this appears to have been directed towards the retaliation and hostile work environment claims. To this, Defendant argues for Plaintiff's waiver

of the issues, questioning whether the Amended Complaint even purported to present a discrimination claim. ECF 24 at PageID# 125.

Having reviewed the pleadings, the Court finds that, for the most part, the Amended Complaint does not assert discrimination so much as it claims retaliation and hostile work environment—the claims will be so construed and discussed below. The one exception lies in the allegations as to Ms. Bennett's alleged manipulative conduct—although the Complaint does not establish the discriminatory animus of any decisionmaker beyond mere speculation, the pleadings loosely suggest age or national origin discrimination by Defendant through a cat's paw theory of liability based on Ms. Bennett's animus against him. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F. 3d 277, 290 (4th Cir. 2004) ("When a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision"). But, assuming *arguendo* that all other elements of discrimination are established, Plaintiff does not plead that his "coworker harboring discriminatory animus toward [him] exercised authority over an adverse employment action that the plaintiff suffered such that the colleague should be viewed as the 'actual decisionmaker' principally responsible[.]" *Barnhill v. Bondi*, 138 F. 4th 123, 134 (4th Cir. 2025). That is, Plaintiff has not plausibly alleged that Ms. Bennett had authority over or was 'in charge of" Ms. Barham, Mr. Frew, HR, or any other person who decided that he should be placed on leave or asked to resign or face termination, even if she somehow "substantially influenc[ed]" those decisions. *Id*. Thus, any discrimination claims founded upon Ms. Bennett's acts will be dismissed.

### C.  Title VII and Section 1981 Retaliation.[20]

_____

[20]    The Court will dispense with analysis of any ADEA retaliation claims as the allegations do not suggest that Plaintiff engaged in any activity protected under that statute.

To state a claim for retaliation in violation of either Title VII or Section 1981, Plaintiff "must show (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action." *Satterfield v. City of Chesapeake*, 2017 WL 11449568, at 13 (E.D. Va. Aug. 31, 2017). Although Plaintiff asserts a variety of retaliation claims, Defendant contends that Plaintiff's claims fail to plausibly establish any of the three required elements.

### i.     Protected Activity

Regarding the first element, protected activity most relevantly includes complaints of race or national origin discrimination, such as those raised through internal company procedures or with governmental entities. *Roberts v. Glenn Indus. Grp. Inc.*, 998 F. 3d 111, 122 (4th Cir. 2021). Some of the actions undertaken by Plaintiff—such as "[d]ocumenting racial slurs, racist gestures, and hate symbols (e.g., swastikas) targeting students and Plaintiff,"[21] "[r]eporting systemic discrimination against Black and Muslim students,"[22] "[r]eporting the intentional display of religious symbols designed to marginalize him,"[23] and filing EEOC and VOCR complaints—fall into this category. Others, like reporting child abuse, animal cruelty in the curriculum, "[r]eporting

---

[21]     Reviewing the Amended Complaint and EEOC charge, the Court discerns that this allegation embraces only the swastika incident, *see supra* note 7; ECF 8-1 at 2 ¶ 11, and Plaintiff's January 2024 reporting of a Hispanic student calling a Black child the n-word. *Id*. ¶ 6. This allegation does not include an April 2023 incident where a White administrator Mr. Taylor used a "disparaging finger gesture," *Id*. at ¶ 14, as there is no suggestion that such has any connection to a protected characteristic or was reported to school officials (although it is included in the EEOC charge that itself constitutes protected activity).

[22]     This allegation embraces: (1) Plaintiff's reporting of a Black child's complaint of discrimination by a White teacher in September 2022, ECF 8-1 at 1, ¶ 2; and (2) Plaintiff's September 2023 reporting of racial discrimination against a Black child whose parents were from Sudan, Africa, *Id*. ¶ 5. But simply "mentioning" a Black Muslim child's "request" for "minor religious accommodation" where co-teacher Ms. Bennett repeatedly tried to force the child to sit between two girls because he was misbehaving does not constitute oppositional protected activity. *Id*. at 2 ¶ 17.

[23]     This allegation again includes the swastika incident but not the display of an image of a church during an October 2022 planning meeting or placement of church materials in Plaintiff's mailbox because there is no suggestion that such was reported, ECF 8-1 at 2 ¶ 15, although it is included in the EEOC charge.

collusion among staff to sabotage meetings and falsify documentation," and unspecified "ongoing harassment and discrimination," do not qualify as protected activity.[24] This narrows the scope of Plaintiff's retaliation claims to the following protected actions only:

- Reporting (to unknown persons) the swastikas drawn in his classroom (because the date is not specified, Section 1981 only). ECF 8-1 at 2 ¶ 11.

- Reporting (presumably to Vice Principal Frew) that a Hispanic student called a Black child the n-word in January 2024 (Title VII and Section 1981). *Id.* ¶ 6.

- Reporting (to unknown persons) a Black child's complaint of discrimination by a white teacher in September 2022 (Section 1981 only) *Id.* ¶ 2.

- Reporting (presumably to Vice Principal Frew) of racial discrimination against a Black child whose parents from Sudan, Africa in September 2023 (Title VII and Section 1981). *Id.* ¶ 5.

- Separately, filing complaints with the VOCR on July 11, 2024 and the EEOC on November 5, 2025. ECF 4 at PageID# 38.

**ii.    Adverse Action and Causation**

On the second element of adverse employment action, Plaintiff must show that "a reasonable employee would have found the challenged action materially adverse," which means that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" from an objective perspective under the circumstances. *Burlington*, 548 U.S. at

---

[24]    Specifically, Plaintiff's September 2023 reporting of child abuse on a live school TV show, ECF 8-1 at 2 ¶ 8, reporting of animal cruelty (not alleged in EEOC charge), and simple "submitting [of] complaints" to HR, *id.* at 2 ¶ 19, have no nexus to race, religion, or national origin discrimination. The same goes for Plaintiff's allegation that his co-teachers Ms. Bennett and Mr. Cowles "were aware that I was having difficulty keeping track of meetings and colluded, on 1/23/2024 to make me miss one," and also colluded "to make me miss a federally mandated IEP meeting," *id.* ¶ 24, which the EEOC charge did not claim to have been reported (although the charge itself constitutes protected activity). Further, although the charge alleges that Plaintiff was "given a negative evaluation and extra work for reporting racial discrimination' and placed on a 'Plan of Improvement,'" *id.* at ¶ 4, there are no allegations in the amended complaint or charge that substantiate this claim, which the Court declines to credit.

68, 69; *id*. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."); *Perkins v. Int'l Paper Co.*, 946 F. 3d 196, 213 (4th Cir. 2019) ("the 'materiality' requirement [is] necessary to ensure that only significant harms [are] actionable"). Additionally, there must be causation between protected activity and adverse action, which is the third essential element of retaliation. At this stage, "[l]ittle is required to plead causation." *Jones v. HCA*, 16 F. Supp. 3d 622, 634–35 (E.D. Va. 2014). But "the decisionmaker's knowledge of the protected activity is 'essential to a retaliation claim.'" *Id*. And, Plaintiff "must plead facts showing a relationship between [the decisionmaker's] knowledge [] and their adverse actions." *Caleca v. Burns*, 2024 WL 4255052, at *8 (E.D. Va. Sept. 20, 2024). Absent other facts suggesting retaliatory animus, a plaintiff may point to temporal proximity between knowledge of protected activity and an adverse employment action, but that proximity must be "very close." *Roberts v. Glenn Indus. Grp., Inc*, 998 F.3d 111, 124, 126-27 (4th Cir. 2021) (no bright-line rule but gap of three months is insufficient to infer causation absent other evidence).

Plaintiff states that "[e]ach of [his seventeen reports to HR] resulted in escalating forms of targeted retaliation, including fabricated charges, negative evaluations, surveillance, isolation, and hostile working conditions. HR received numerous complaint [] but neglected to address them." Am. Compl. at PageID# 37. He also suggests that his negative evaluations in the 2023-24 school year were "part of a deliberate campaign to terminate his employment" and that the false claim that he "failed to submit his Plan of Improvement [] documentation" was used to justify further retaliation including placement on a "Support Plan" "that was in essence a covert termination track." *Id*. at PageID# 38. And he asserts that Defendant, in response to his VOCR and EEOC complaints, "mailed two letters on February 13, 2025—just one working day before the deadline

to sue—labeling one of the charges (fabricated by Bennett and Barham) as 'founded' and ensuring it remained in Plaintiff's personnel file to damage future employment." *Id*.

Plaintiff does not plausibly allege any adverse action causally linked to the aforementioned protected activities.

Plaintiff claims that in response to his raising discrimination by a White teacher against a Black child in September 2022, he was charged with creating a hostile work environment and threatened with termination, even though the charge was at some point determined to be unfounded. ECF 8-1 at 1 ¶ 2. But the mere initiation of an internal investigation, without more, is not an adverse employment action. *Mulgrew v. Prince William Cnty. Sch. Bd.*, 2023 WL 7222108, at *3 (E.D. Va. Nov. 2, 2023); *Holmes v. WMATA*, 723 F. Supp. 3d 1, 18-19 (D.D.C. 2024). Nor is an "unrealized threat of termination" adverse absent "special circumstances . . . such as a unique interpersonal relationship between the supervisor and employee' [can] render an 'unrealized threat of termination' sufficiently adverse to be actionable.'" *Patterson v. Va. Dep't of Corr.*, 2024 WL 1704669, at *5 (E.D. Va. April 19, 2024) (quoting *Noonan v. Consolidated Shoe Co., Inc.*, 84 F. 4th 566 (4th Cir. 2023)). Thus, that Plaintiff was subject to an unfounded charge, brought by some unspecified decisionmaker with unclear knowledge, cannot form the basis of a retaliation claim.

Nor do unspecified school officials' refusal to take Plaintiff's complaint of a swastika being posted in his classroom "seriously," with Dr. Gallardo regarding the swastika as an "element of speech" and disagreeing with Plaintiff's argument that it was a "symbol of hate," constitute adverse action as it is a simple failure to investigate or act.[25] ECF 8-1 at 2 ¶ 11; *Volpe v. Conn. Dep't of*

---

[25]    The same goes for the nondescript "surveillance" (being "stalked" by Dr. Gallardo in the hallways), to the extent it is connected to the swastika incident by way of Gallardo. ECF 8-1 at 2 ¶ 13; *Tapia v. City of Albuquerque*; *Simms v. Navy Fed. Credit Union*, 2002 WL 32971969, at *5 (E.D. Va. Aug. 27, 2002) (monitoring in ordinary course is a "basic employment practice"); *see Tapia*, 170 F. Appx 529, 533 (10th Cir. 2006) ("sufficiently severe" monitoring creates adverse employment action).

*Mental Health and Addiction Servs.*, 88 F. Supp. 3d 67, 75-76 (D. Conn. 2015); *Hamby v. WNBA, LLC*, 2025 WL 1331494, at *10-11 (D. Nev. May 6, 2025) (failure to investigate is not adverse action unless failure was retaliation for employee's separate protected act).

On the report of racial discrimination against a Black child in September 2023, Plaintiff claims that he was "threatened" by Principal Frew in response to reporting. ECF 8-1 at 1 ¶ 5. But this allegation cannot be credited as adverse because it is conclusory and devoid of factual detail as to the threat.

Principal Frew's meeting Plaintiff's report of a Hispanic student calling a Black child the n-word in January 2024 by visiting Plaintiff's classroom and telling Plaintiff not to report the slur on Microsoft Teams "as per the protocol" comes closer but still does not plead adverse action. ECF 8-1 at 1 ¶ 6. For while this action seems to function more directly to dissuade Plaintiff from engaging in protected activity, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington*, 548 U.S. at 69. Here, the allegations belie the notion that a reasonable worker would be dissuaded, as Plaintiff does not allege that Frew actually refused to accept Plaintiff's reports, including by other means, nor does Plaintiff appear to have been dissuaded from making further reports. *See* ECF 8-1 at 2.

Notwithstanding their lack of any plausible connection to the above protected activities, Plaintiff's other theories of causation and adversity also falter.

In one string of events, Plaintiff posits that his protected activity resulted in "eight fabricated charges" against him, Am. Compl. at PageID# 37, which were orchestrated by his co-teacher Ms. Bennett, who "manipulated students" to "concoct them", ECF 8-1 at 2 ¶ 28. Bennett then presented the charges, "based on malicious misrepresentations and Islamophobic stereotypes," to Vice Principal Barham, who further "endorsed" them and forwarded them to HR,

which used them to remove Plaintiff from campus and put him on paid leave in February 2024. Am. Compl. at PageID# 36; ECF 8-1 at ¶ 28. Eventually, on February 13, 2025, "just one working day before the deadline to sue" and in further retaliation for filing VOCR and EEOC complaints on June 11, 2024 and November 5, 2024, Defendant mailed Plaintiff a letter determining one of the charges to be "founded," which was placed in Plaintiff's personnel file to "damage future employment." Am. Compl. at PageID# 38. Setting aside the tenuous relationship of these events to the protected activity,[26] none of these actions are adverse, at the very least because there is no allegation that Plaintiff suffered disciplinary action or detrimental changes in the terms of his working conditions as a result.[27] *See Mulgrew*, 2023 WL 7222108, at *3, 4 (investigation, paid administrative leave, and retirement not adverse actions); *Gregory v. City of Virginia Beach*, 428 F. Supp. 2d 422, 431-32 (E.D. Va. 2006) (investigation without larger effect on terms, conditions, or benefits of employment is not adverse action); *Hornsby v. Watt*, 217 F. Supp. 3d 58, 67 (D.D.C. 2016) (paid administrative leave, absent inference of objectively tangible harm, is not adverse action); *Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 75-76 (D.D.C. 2011) (placement of reprimand in personnel file absent "abusive language" or discipline not adverse action).

---

[26]    Neither Bennett nor Barham are clearly alleged to have knowledge of the protected activities. It is not even clear that the decisionmakers as to the "fabricated charges" had knowledge of the protected activities and any notion that they bore retaliatory animus to Plaintiff is speculative.

   With respect to June 2024 VOCR and November 2024 EEOC complaints specifically, the investigation resulting from Bennett and Barham's complaints was initiated at least four months prior to the filing of the VOCR complaint and nine months before the EEOC complaint. Plaintiff was notified that one charge against him was founded in February 2025, about one year after the investigation was initiated, eight months after the VOCR complaint, and three months after the EEOC complaint. Plaintiff pleads no facts that suggests retaliatory animus by Defendant and the timeline does not support a causal link based on "very close" temporal proximity. *Roberts*, 998 F.3d at 124 (gap of three months, absent "any concrete, nonspeculative evidence," insufficient to support causal link)

[27]    Notably, there is no allegation that the end of Plaintiff's employment came about as a result of these events in one way or another. Rather, the Amended Complaint suggests that his termination or resignation was the product of events surrounding negative evaluations, discussed below.

In another bundle of occurrences, Plaintiff asserts that his protected activity resulted in two undeserved negative evaluations and that administrators engaged in "further retaliation" by falsely claiming he failed to submit his "Plan of Improvement" documentation and using this to justify imposition of a "support plan" that was essentially a "covert termination track." Am. Compl. at PageID# 37, 38. One of the negative evaluations included Principal Frew and Vice Principal Barham's "defamatory summative evaluation" presented to Plaintiff on May 13, 2024, which misspelled his name forty times (including "crossed-out and rewritten on the cover page, despite HR being informed of these occurrences previously") and marked all fifty-four teaching standards as "not met, which was unprecedented." *Id*. at 37; ECF 8-1 at 2 ¶ 21. It was at this meeting that Plaintiff was presented a blank resignation form and given five working days to resign or face termination, and Plaintiff ultimately chose to resign on May 17, 2024. Once again, no facts alleged suggest that any of these events are plausibly connected to Plaintiff's protected activity. Further, even though placement on a performance improvement plan, findings of noncompliance with the plan, and negative evaluations pursuant to the plan may constitute adverse action "if the employer relies upon it to later take additional action, such as discharging or demoting the employee," *Michael v. Va. Commonwealth Univ.*, 2019 WL 128236, at *4 (E.D. Va. Jan. 8, 2019), no such additional action occurred here, where Plaintiff resigned. Plaintiff's resignation, taken alone or with these other performance actions, does not constitute adverse action because it was voluntary and he does not (and could not on the current facts) plausibly allege constructive discharge.[28]

---

[28]   As Defendant recognizes, resignation may constitute a constructive discharge that meets the adverse action element where the employer "deliberately makes an employee's working conditions so intolerable that the employee is force into involuntary resignation." *Martin v. Cavalier Hotel Corp.*, 48 F. 3d 1343, 1354 (4th Cir. 1995). That scenario is not relevant here, where Plaintiff resigned "[u]nder threat and pressure" from Defendant when confronted with resignation or termination, rather than intolerable working conditions.

While it is generally true that a "personal choice" to "[v]oluntar[ily] resign[] does not constitute an adverse employment action, even if there are pending disciplinary matters," *Satterfield v. City of Chesapeake, Va.*, 2021 WL 4812452, at *7 (E.D. Va. Oct. 14, 2021), resignation may also amount to constructive discharge where "the resignation

Plaintiff's Title VII and Section 1981 retaliation claims thus fail and will be dismissed.

### D.  Title VII, Section 1981, and ADEA Hostile Work Environment[29]

Defendant further seeks to dismiss Plaintiff's claims of hostile work environment under Title VII, Section 1981, and ADEA. "To establish a hostile work environment under any of these three Acts, plaintiff must allege conduct that was (i) unwelcome; (ii) based on a protected class; (iii) sufficiently severe or pervasive to alter the terms or conditions of plaintiff's employment; and (iv) imputable to [his] employer." *Sarraj v. N. Va. Elec. Coop.*, 2022 WL 2820553, at *8 (E.D. Va. 2022) (collecting cases). Relevant to the requirement that the conduct must be "severe or pervasive" are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

---

is deemed to be coerced or involuntary." *Bauer v. Holder*, 25 F. Supp. 3d 842, 852 (E.D. Va. 2014), *vacated on other grounds by Bauer v. Lynch*, 812 F. 3d 340 (4th Cir. 2016). "That is so because an employer cannot avoid its legal obligations [] 'by the simple expedient of forcing involuntary resignations.'" *Id*. The Court looks to whether there is a lack of free choice, considering evidence of "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time to choose; and (4) whether the employee was permitted to select the effective date of resignation." *Id.* The mere fact that the choice is between resignation or termination for cause does not render it involuntary, "unless the employer actually lacked good cause to believe that grounds for termination existed." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F. 2d 167, 174 (4th Cir. 1988).

Here, the record before the Court supports a finding that Plaintiff's resignation was voluntary, not coerced, and not an adverse action. The first factor favors involuntariness to a moderate degree, as although Plaintiff's alternatives were narrow, this is not a case where Plaintiff "could choose only how [the immediate end of his employment] would occur," because the alternative to immediate termination was resignation with an effective date approximately one month out. *See Bauer*, 25 F. Supp. 3d at 852. But the other factors cut against coercion. Plaintiff understood the nature of the choice before him, as he acknowledged Defendant's warning that "termination would damage future employment" and noted on his resignation that he was "threatened with termination." ECF 4 at PageID# 37. Plaintiff was not required to make an on-the-spot decision but rather given five weekdays to make his choice, ultimately doing so on the last day. *See id*. And, it appears that he had some choice in the effective date of his resignation, as it was set for one month out. *Id*. Further, the pleadings establish that Defendant had good cause to terminate him based on failure to meet teaching standards and for failure to miss mandatory meetings and IEP sessions, which Plaintiff does not deny except to claim in a conclusory manner that his failures were unprecedented and the result of collusion. Am. Compl. at PageID# 37. Altogether, the facts presently before the Court do not plausibly establish constructive discharge. And, in any case, Plaintiff fails to show a causal link between his protected activities and any possible constructive discharge.

[29]      The Court assumed all non-discrete acts identified in note 19 *supra* were properly considered under the continuing violation theory in evaluating the Title VII hostile work environment claim, as Defendant noted that it "challenges Plaintiff's hostile work environment claim on other grounds." ECF 24 at PageID#118.

with an employee's work performance." *Okoli v. City of Baltimore*, 648 F. 3d 216, 220 (4th Cir. 2011). The "status of the harasser may [also] be a significant factor" because "a supervisor's power and authority invests his or her harassing conduct with a particularly threatening character." *Sonnier v. Diamond Healthcare Corp.*, 114 F. Supp. 3d 349, 356 (E.D. Va. 2015).

To begin, Plaintiff's ADEA hostile work environment claim fails because the only conduct that bears any relation to his age (Ms. Bennett's referring to his age in class "several" times, ECF 8-1 at 2 ¶ 25, and stating he was "too old to be acting like this," Am. Compl. at PageID# 38) is not objectively severe or pervasive. Assuming that Bennett's comments are imputable to Defendant,[30] they comments constitute "callous," "offhand," or "rude treatment" by a coworker, but they amount to "isolated incidents" that do not bear the force required to "permeate[] [a workplace] with discriminatory intimidation, ridicule, and insult" as to alter the terms and conditions of employment. *Evans v. Int'l Paper Co.*, 936 F. 3d 183, 192 (4th Cir. 2019).

The claims of hostile work environment founded upon Plaintiff's other protected characteristics—be that race (Asian), national origin (Pakistan), color (Brown), or religion (Muslim), ECF 8-1 at 2—fare little better. Most of the alleged conduct is either couched in conclusory terms or again has no nexus to Plaintiff's membership in a protected class.[31] Plaintiff also fails to plead an imputable action in the student bomb threat, as while student harassment "can form the basis for a viable claim . . . if the harassment is severe," *Webster v. Chesterfield Cnty.*

---

[30]    It is doubtful that Bennett's comments are imputable to Defendant because it "knew or should have known about the harassment" such that it could have taken "effective action to stop it." *Twine v. AT&T*, 755 F. Supp. 3d 959, 978-79 (E.D. Va. 2024). Neither the Amended Complaint nor EEOC Charge suggest that Defendant was ever informed of Bennett's comments.

[31]    This conduct includes the allegations of bullying, denial of racial/ethnic support persons, collusion by Ms. Bennett and Mr. Cowles, surveillance, defamation, intimidation and stalking, "intentional setup to fail," segregation or isolation, removal of his desk, a White administrator's asking Plaintiff to step out of his classroom "with a disparaging finger gesture," reprimand for providing "differentiated math instruction to a Pakistani student" and for asking if language aides were provided to immigrants students with limited language proficiency, and threats by "inquiring about his daughters' [] well-being." *See supra* Section I.A; ECF 4; ECF 8-1.

*Sch. Bd.*, 2020 WL 6064352, at *3 (E.D. Va. Oct. 14, 2020), Plaintiff must also show that the school board "knew of the harassment and failed to take appropriate remedial action." *Berger-Rothberg v. City of New York*, 803 F. Supp. 2d 155, 165 (E.D.N.Y. 2011); *Twine*, 755 F. Supp. 3d at 978-79 ("Effective action requires the employer 'to take prompt remedial action reasonably calculated to end the harassment.'"). Plaintiff, however, does not suggest that the student's harassment continued after he was placed in a different classroom such that Defendant's response was ineffective—only that he continued to feel unsafe regardless. *See Bazemore v. Best* Buy, 957 F. 3d 195, 202–03 (4th Cir. 2020) (co-worker conduct not plausibly alleged as imputable because discipline was reasonably calculated to end harassing behavior and in fact did so—"so long as the discipline is reasonably calculated to end the behavior, the exact disciplinary actions lie within [defendant's] discretion"). Finally, the remaining conduct of (1) Defendant subjecting Plaintiff to "inappropriate questioning when seeking to start his Muslim Cultural Bridges Club," (2) an instructor projecting an image of a church during a planning session and employees placing church materials in Plaintiff's mailbox, (3) administrators not taking seriously Plaintiff's complaint of two swastikas drawn in his classroom, and (4) Ms. Bennett's insulting of Plaintiff including calling him a "Paki,"[32] is also largely devoid of factual detail and in any case, is not so frequent, threatening, or interfering to plausibly amount to a severe or pervasive environment.

Plaintiff's hostile work environment claims thus fail and will be dismissed.

**E. Due Process**

---

[32]     Undoubtedly, Bennett's use of the "Paki" slur is highly offensive to persons of Plaintiff's national origin, and the swastika is an equally weighty symbol of hate, but viewing the harassing conduct as a whole, these incidents were isolated, not perpetrated by superiors, and stand in marked contrast to the other, far mor innocuous conduct identified by Plaintiff. *Hubbard v. S. Carolina Dep't of Mental Health*, 2023 WL 5666202, at *2 (4th Cir. Sept. 1, 2023) (single use of n-word and posting of monkey poster by persons other than supervisor or manager did not constitute severe or pervasive conduct as required to state a claim).

Lastly, Defendant argues for dismissal of Plaintiff's due process claims, asserting that Plaintiff was not entitled to any due process associated with the end of his employment because he voluntarily resigned and does not identify any applicable substantive due process rights. ECF 8 at PageID# 72, 73. Plaintiff does not clearly respond to these points but argues that his resignation was coerced. ECF 16 at PageID# 96, 97.

The Amended Complaint fails to state a due process claim. To the extent it asserts a procedural due process theory, "there is no question that [Plaintiff] had a constitutionally protected 'property' interest in his continued employment with" Defendant, but as previously explained *supra* note 28, the record before the Court establishes that Plaintiff's resignation was the product of a free choice such that there was no deprivation for which process was due. *Stone*, 855 F. 2d at 172-75. To the extent that the claims assert a substantive due process theory, Plaintiff identifies no conscience-shocking exercise of governmental power or relevant constitutional fundamental interest that is transgressed by Defendant's actions here. *D.B. v. Cardall*, 826 F. 3d 721, 740 (4th Cir. 2016) ("We have characterized substantive due process as 'far narrower in scope than procedural due process.'"). Accordingly, Plaintiff's due process claims will also be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Plaintiff's Motion to Redact Names of Minors, Clarify Defendant, Amend Response, and Extend Hearing Date (ECF 25) is GRANTED IN PART and DENIED IN PART as moot; and it is further

ORDERED that Defendant's Motion to Dismiss (ECF 7) is GRANTED; and it is further

ORDERED that the Amended Complaint (ECF 4) be, and is, dismissed in its entirety.

The Clerk of Court is directed to terminate this civil action and to forward a copy of this Memorandum Opinion and Order to counsel of record and Plaintiff *pro se* at his last known address.

**IT IS SO ORDERED.**

/s/
_____
Michael S. Nachmanoff
United States District Judge

December 5, 2025
Alexandria, Virginia